**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

- - - - - - -

PANASONIC HOLDINGS CORPORATION, )
                                )   **CERTIFIED**
          Plaintiff,            )
                                )
     vs.                        ) No. 8:19-CV-01118-DOC
                                )    Day 2, Volume I
GETAC TECHNOLOGY CORPORATION;   )
GETAC, INC.,                    )
                                )
          Defendants.           )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Jury Trial

Santa Ana, California

Wednesday, June 1, 2022

Debbie Gale, CSR 9472, RPR, CCRR
Federal Official Court Reporter
United States District Court
411 West 4th Street, Room 1-053
Santa Ana, California 92701
(714) 558-8141

**APPEARANCES OF COUNSEL:**

FOR PLAINTIFF PANASONIC HOLDINGS CORPORATION:

        Kenneth G. Parker
        HAYNES AND BOONE, LLP
        600 Anton Boulevard, Suite 700
        Costa Mesa, California 92626
        949-202-3014
        ken.parker@haynesboone.com

        Jason T. Lao
        HAYNES AND BOONE, LLP
        600 Anton Boulevard, Suite 700
        Costa Mesa, California 92626
        949-202-3051
        jason.lao@haynesboone.com

        Andrea Levenson
        HAYNES AND BOONE, LLP
        600 Anton Boulevard, Suite 700
        Costa Mesa, California 92626
        949-202-3000
        andrea.levenson@haynesboone.com


FOR DEFENDANT GETAC TECHNOLOGY CORPORATION; GETAC, INC.:

        Joseph N. Akrotirianakis
        KING & SPALDING LLP
        633 West Fifth Street, Suite 1600
        Los Angeles, California 90071
        213-443-4355
        jakro@kslaw.com

        Christopher C. Campbell (pro hac vice)
        KING & SPALDING LLP
        1700 Pennsylvania Avenue NW, Suite 200
        Washington, DC 20006
        202-626-5578
        ccampbell@kslaw.com

        Britton F. Davis (pro hac vice)
        KING & SPALDING LLP
        1401 Lawrence Street, Suite 1900
        Denver, Colorado 80202
        720-535-2300
        bfdavis@kslaw.com

**APPEARANCES (CONTINUED):**

FOR DEFENDANT GETAC TECHNOLOGY CORPORATION; GETAC, INC.:

    Brian Eutermoser
    KING & SPALDING LLP
    1401 Lawrence Street, Suite 1900
    Denver, Colorado 80202
    720-535-2312
    beutermoser@kslaw.com

    Cori Cudabac Steinmann
    KING & SPALDING LLP
    500 West 2nd, Suite 1800
    Austin, Texas 78701
    512-457-2000
    csteinmann@kslaw.com

SPECIAL MASTER (Present):

    Alan Ball
    ALAN BALL INDUSTRIAL DESIGN (A.B.I.D.)
    50 Francesca Avenue
    Somerville, Massachusetts 02144-2002
    617-718-9342
    aball@abidstudio.com Alan Ball

ALSO PRESENT:

Neil Passey, plaintiff trial presentation technician

T.J. Patel, defense trial presentation technician

Joshua Courtney

INTERPRETER:

    Kaoru Tamura, Japanese language

**I N D E X**

| PROCEEDINGS | | | PAGE |
|---|---|---|---|

JURY TRIAL - DAY 2, VOLUME I

KOIDE, Masashi (resumed)                                6

Video recording played, Exhibit Number 2117           15

ROWLEY, Brian (called by plaintiff)                   17

KITADE, Katsuhiro (called by plaintiff)              40

**WITNESSES**

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| KOIDE, Masashi | | | | |
| By Mr. Parker | 6 | | 16 | |
| By Mr. Campbell | | 12 | | |
| | | | | |
| ROWLEY, Brian | | | | |
| By Mr. Parker | 18 | | | |
| By Mr. Eutermoser | | 34 | | |
| | | | | |
| KITADE, Katsuhiro | | | | |
| By Mr. Lao | 41 | | 56 | |
| By Mr. Davis | | 51 | | |

**EXHIBITS**

| EXHIBIT NO./DESCRIPTION | IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| 15   Email with calendar invite from Hoshika Naoki re Getac K120 dissembly | | 13 |

**EXHIBITS (CONTINUED)**

| EXHIBIT NO./DESCRIPTION | IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| 60    Panasonic Toughbook/Toughpad research by Spiceworks | | 24 |
| 78    Panasonic Mobility Solutions | | 28 |
| 2117    Video | | 15 |
| 2162    File History to U.S. Patent No. D756,998 | | 8 |
| 2166    File History to U.S. Patent No. D895,634, issued May 2, 2017 | | 7 |

8:19-CV-01118-DOC - 6/1/2022 - Day 2, Volume I

6

SANTA ANA, CALIFORNIA, WEDNESDAY, JUNE 1, 2022

**Day 2, Volume I**

(8:15 a.m.)

THE COURT:  All right.  Counsel, good morning. The parties, good morning.  We're back in session.  The jurors are present.  All counsel, if you'd be seated.  Thank you for your courtesy and the parties.

**MASASHI KOIDE, CALLED BY THE PLAINTIFF,**

**PREVIOUSLY SWORN, RESUMED THE STAND**

*(Witness testifies through the Japanese language Interpreter as follows:)*

THE COURT:  Counsel, if you'd like to continue your direct examination on behalf of Panasonic, please.

MR. PARKER:  Thank you, Your Honor.

**DIRECT EXAMINATION** (continued)

BY MR. PARKER:

Q.   Good morning, Mr. Koide.

A.   Good morning.

Q.   Do you understand you're still testifying under oath today?

A.   I do understand.

Q.   Mr. Koide, what did you do at Panasonic prior to 2007 before you worked for the patent design department?

A.   Well, I have always been working in relation to design patent work from 2007 until now.

Q.   And what did you do prior to 2007?

A.   Yes.  I had worked as a designer who worked on the exterior appearances of products.

Q.   Mr. Koide, I'd like to show you Exhibit 2166.  That's in your notebook in front of you.

THE COURT:  Is there somebody beside this witness to get that exhibit for him, as I instructed?  Thank you.

Sir, somebody's going to get that for you.  You shouldn't have to fumble through the exhibits.

MR. PARKER:  My apologies, Your Honor.

THE COURT:  That's fine.  It's not a problem, Counsel, but it saves a lot of time.

Thank you.  And you can stand behind him if you'd like to.

All right.  Counsel.

BY MR. PARKER:

Q.   Mr. Koide, what's -- do you have Exhibit 2166 in front of you on the lower right-hand corner?

A.   Yes, I have 2166.

Q.   And what is Exhibit 2166?

A.   This is a filing schedule for D'634 design patent.

MR. PARKER:  Your Honor, I move in Exhibit 2166.

THE COURT:  Received.

*(Exhibit Number 2166 received in evidence.)*

*(Document displayed.)*

BY MR. PARKER:

Q.   Mr. Koide, are you also familiar with the file history of the D'998 patent?

A.   Yes.

Q.   Can you look at Exhibit 2162, please?

A.   Yes, I have it.

Q.   What is Exhibit 2162?

A.   This is the filing schedule for the design patent D'988 [sic].

          MR. PARKER:  Your Honor, I move in Exhibit 2162.

          THE COURT:  Received.

     *(Exhibit Number 2162 received in evidence.)*

     *(Exhibit displayed.)*

BY MR. PARKER:

Q.   Mr. Koide, are you familiar with the assignment history of the three patents in suit in this case?

A.   Yes.  I know.

Q.   Can you take a look at Exhibit 886, please.

          MR. CAMPBELL:  Excuse me, Your Honor.  I don't have a copy of that in my binder.

          THE COURT:  All right.  You can look over his shoulder, then.

          We don't won't waste time, Counsel.

          MR. CAMPBELL:  Thank you, Your Honor.

          THE COURT:  All right.  Counsel, let's proceed

Case 8:19-cv-01118-DOC-DFM    Document 474    Filed 10/22/24    Page 9 of 59    Page ID
#:22997
8:19-CV-01118-DOC - 6/1/2022 - Day 2, Volume I

9

now.  Thank you.

MR. CAMPBELL:  Sure.

BY MR. PARKER:

Q.   Mr. Koide, the current plaintiff in this case is Panasonic Holdings Corporation; is that correct?

A.   Yes.  At the current time, it's Panasonic Holdings Corporation.

Q.   And to your understanding, is Panasonic Holdings Corporation the name of what until earlier this year was Panasonic Corporation?

A.   Yes.  As of April 1st of this year, it changed from Panasonic Corporation to Panasonic Holdings -- um, Company Limited or Corporation.

MR. PARKER:  (To interpreter:) I'm sorry, ma'am. Can you say it again?

THE INTERPRETER:  The interpreter wasn't sure whether it's translated as "corporation" or "company limited."

BY MR. PARKER:

Q.   But it's Panasonic Holdings?

A.   Yes, it is.

Q.   Mr. Koide, I'm gonna show you the -- I'm gonna show you Exhibit 1353, the Panasonic CF-50 -- strike that -- the CF-33 computer.

THE COURT:  Counsel, what exhibit, again, is it?

MR. PARKER:  1353, Your Honor.

THE COURT:  1353.  Thank you.

BY MR. PARKER:

Q.   And do you recognize the CF-33, sir?

A.   Yes.  This is our company's Toughbook CF-33.

Q.   And can you open the laptop up?

And can you hold it out so the jury can see the CF-33 computer?

A.   (Complies.)

Q.   Thank you, sir.  Can you put that down?

And, Mr. Koide, I'munna show you Exhibit 2175, the K120 computer.

And have you seen Exhibit 2175, the K120 computer, before?

A.   Yes, I have.

Q.   And can you open up the K120 computer and show that to the jury?

A.   (Complies.)

Q.   Thank you, Mr. Koide.

Mr. Koide, all tolled, how many patents -- design patents and utility patents does Panasonic hold in the laptop tablet mobile -- mobile phone and handheld product segment?

A.   I would say probably 1400 or more.

Q.   Do you remember having any reaction when you first saw

the Getac K120 that's in front of you as Exhibit 2175?

A.    (Answers in Japanese.)

Q.    And what was your reaction to it?

A.    Wow!

Q.    Can you put that into words?

A.    I was completely stunned.

Q.    And why were you stunned?

A.    Because this design had so much of the features of our product and they were selling it.

Q.    And did that concern you?

A.    Yes.  The concern I had was that because Getac is our competitor, by their putting out this kind of a product, that it's basically a replacement for our own product.

Q.    And when you say "replacement," do you mean a replacement that's legal and appropriate in the competitive marketplace, or do you mean something that is not appropriate?

A.    I feel that by their selling the same features of our products for cheaper price, that they're trying to get our share in the market.

Q.    Were you involved in the decision to file this lawsuit, Mr. Koide?

A.    Yes, I was involved.

Q.    And did you approve the filing of it?

A.    I'm not in a position to give the approval, so what I

did was to take it up to our top management for their approval.

Q.    And why did Panasonic file this lawsuit?

A.    Well, as I said before, this product was something which basically copied our design way too much.  And they are selling the same product at a lot less price than we were selling.  And that was really unforgivable.

            MR. PARKER:  No further questions at this time, Your Honor.

            THE COURT:  All right.  Cross-examination, please.

                    **CROSS-EXAMINATION**

BY MR. CAMPBELL:

Q.    Panasonic conducts research on competitors; correct?

A.    We do.

Q.    There is nothing wrong with conducting research on competitors; correct?

A.    That's right.

Q.    Turn to Exhibit 15 in your binder.  You recognize this document; correct?

A.    Yes, I do.

            MR. CAMPBELL:  Pardon, Your Honor.  I neglected to give a binder to Panasonic's counsel.  I will get that right now.

            This is -- Your Honor, I move to admit Exhibit 15.

            THE COURT:  What is it?

Case 8:19-cv-01118-DOC-DFM   Document 474   Filed 10/22/24   Page 13 of 59   Page
ID #:23001
8:19-CV-01118-DOC - 6/1/2022 - Day 2, Volume I

13

          MR. CAMPBELL:  It is an invite to a meeting where
there's going to be disassembly of a Getac K120, and he'd
recognize the document, Your Honor.

          THE COURT:  Lay the foundation that he recognizes
it.

BY MR. CAMPBELL:

Q.   You recognize this document; correct?

A.   Yes.

          THE COURT:  Received.

          (Exhibit Number 15 received in evidence.)

          MR. CAMPBELL:  Thank you, Your Honor.

          THE COURT:  This is an invite to a meeting to
disassemble a Getac 120; correct?

          THE WITNESS:  Yes, it is.

BY MR. CAMPBELL:

Q.   Panasonic CF-20 and CF-30 had a problem with
disconnection and wobble; correct?

          THE INTERPRETER:  Did you say "this connection" or
"disconnection?

          MR. CAMPBELL:  Yes, DIS, disconnection.  Thank
you.

          THE WITNESS:  What?  I apologize, but I personally
am not aware of such conversation.

BY MR. CAMPBELL:

Q.   You are aware that Panasonic created a video

apologizing to its customers for the problems with the CF-20; correct?

A.    I apologize.  I don't know.

MR. CAMPBELL:  Please show to the witness Exhibit 2117.  I would like the witness to identify the gentleman who is shown on the frame of a video, which is 2117.

(Exhibit displayed.)

MR. CAMPBELL:  Without publishing it to the jury, please.

(Display removed.)

MR. CAMPBELL:  Without publishing it, Mr. Patel.

BY MR. CAMPBELL:

Q.    Do you see an image of a gentleman on a screen in front of you, sir?

TECHNICIAN:  Am I able to just publish --

THE INTERPRETER:  It doesn't appear on the screen, sir.

MR. CAMPBELL:  I'm sorry, I didn't hear the answer.

THE COURT:  It doesn't appear on the screen.

MR. CAMPBELL:  With the Court's permission, I'd like to allow Mr. --

THE COURT:  I'll give you the leeway to put it up.

(Exhibit displayed.)

MR. CAMPBELL:  Thank you, Your Honor.

BY MR. CAMPBELL:

Q.   Mr. Koide, you recognize the gentleman on the screen; correct?

A.   Yes.

Q.   Who is he?

A.   This is Mr. Tagao.

Q.   What is his title?

THE COURT:  Just a moment.  Could you spell that name for us, please?

THE WITNESS:  T-A-G-A-O.  And he is a head of the development for R&D center.

BY MR. CAMPBELL:

Q.   You know this gentleman; correct?

A.   Yes.

MR. CAMPBELL:  Your Honor, we would move to admit Exhibit 2117 and ask that it be played to the jury.

THE COURT:  Received.

*(Exhibit Number 2117 received in evidence.)*

MR. CAMPBELL:  Thank you.

Mr. Patel, please play the video for the jury.

*(Video recording played, not reported.)*

MR. CAMPBELL:  Your Honor, I pass the witness.

THE COURT:  Redirect examination, please.

MR. PARKER:  Thank you, Your Honor.

**REDIRECT EXAMINATION**

BY MR. PARKER:

Q.   Mr. Koide, we were just watching a video, and if I recall your testimony, you don't know anything about -- you don't have any personal knowledge of this wobble issue that Mr. Campbell mentioned, do you?

A.   Yes, I work in a design patent area, so I don't have knowledge about the technical issues.

Q.   You did, however, see the CF-33 and CF-20 computers and their cradles when they were first sold; is that right?

A.   Yes, I did.

Q.   I'd like to show you the screen of that video 2117 that Mr. Campbell just showed you at 36 seconds.

     *(Exhibit displayed.)*

BY MR. PARKER:

Q.   Do you recognize the cradle at 36 seconds in 2117?

A.   Yes, I've seen it.

Q.   Is there any aesthetic difference in the design of thatdesign cradle between the picture in front of you and any production version of a CF-33 or CF-20 that you've ever seen?

A.   Are you talking about the difference between the patent -- any difference between the patent diagram and the actual product?

Q.   No.   I'm asking whether you saw any aesthetic change in

the cradle of the product as it's sold today versus how it was originally sold.

A.    To me, I can't tell any difference.

MR. PARKER:  Nothing further, Your Honor.

THE COURT:  And recross-examination, please.

MR. CAMPBELL:  No questions, Your Honor.

THE COURT:  All right.  Sir, we're going to ask you to remain on call.  The case will conclude by next Tuesday.  Thank you very much, sir.  You may step down from the witness stand.

*(Witness steps down, remains on call.)*

THE COURT:  Counsel, if you'll be kind enough to call your next witness, please.

MR. PARKER:  Your Honor, Panasonic calls Brian Rowley to the stand.

THE COURT:  All right.  Thank you.

Thank you, sir.  If you'd step forward between the double doors.  If you'd raise your right hand, sir, and the clerk will administer an oath to you.  Karlen's right here.

**BRIAN ROWLEY, CALLED BY THE PLAINTIFF, SWORN**

THE WITNESS:  I do.

THE COURT:  Thank you, sir.  If you'd be seated in the witness box just to my right.  The entrance is closest to the wall.

Sir, after you're seated, would you face the jury.

Would you state your full name for the jurors, please.

THE WITNESS:  Brian Rowley.

THE COURT:  Would you spell your last name, sir.

THE WITNESS:  Brian Rowley.

THE COURT:  Spell you last name, sir.

THE WITNESS:  R-O-W-L-E-Y.

THE COURT:  All right.  You don't have to lean as far forward so you're uncomfortable.  You can actually pull that microphone towards you closer.

All right.  Counsel, thank you.

Direct examination, please.

**DIRECT EXAMINATION**

BY MR. PARKER:

Q.   Good morning, Mr. Rowley.

A.   Good morning.

Q.   Can you tell me where you work, please?

A.   Panasonic.

Q.   And how long have you been at Panasonic?

A.   Six and a half years.

Q.   And what is your title at Panasonic?

A.   Vice president of marketing.

Q.   And can you tell the jury what you do as vice president of marketing?

A.   Sure.  I'm responsible for five business units within the organization, so I have responsibility for our mobility

8:19-CV-01118-DOC - 6/1/2022 - Day 2, Volume I

19

business, our professional imaging and visual systems business, our enterprise business as well as our process automation and digital solution center.

Q.   Do any of those units include marketing for the Toughbook products?

A.   Our mobility business.

Q.   What is go-to marketing?

A.   So our go-to market is a strategy which we use to deploy market -- products into the market.

Q.   Are you familiar with the Panasonic CF-20 computer?

A.   I am.

Q.   And are you familiar with the Panasonic CF-33 computer?

A.   I am.

Q.   Were you familiar with those computers prior to joining Panasonic?

A.   I was.

Q.   Why?  Why's that?

A.   Prior to joining Panasonic, I worked for Verizon Wireless, and as part of their strategy they embedded --

        (Court reporter requests clarification for the record.)

        THE WITNESS:  And I was responsible for making sure that those products were part of the Verizon network.

BY MR. PARKER:

Q.   Based on your experience with the CF-20 and the CF-33

Case 8:19-cv-01118-DOC-DFM    Document 474    Filed 10/22/24    Page 20 of 59   Page
ID #:23008
8:19-CV-01118-DOC - 6/1/2022 - Day 2, Volume I

20

products, does the product design and, I mean, aesthetic
design of the CF-20 and the CF-33 matter?

A.    Absolutely.

Q.    Why?

A.    Um, a big part of the brand is associated with the
design of the products.  The product's been in market for
over 26 years, and people have grown to become accustomed to
certain elements of the design of the product as an
association with brand.

Q.    And how do you know that?

A.    We've done focus groups with customers, talking
specifically about the design of the product, and we've also
done a lot of work from overall marketing and -- and
feedback that we received from the market in regard to that
through customer forums and innovations events.

Q.    And can you describe more of the feedback relevant to
the aesthetics of the CF-20 and CF-33 that you've received
in these focus groups?

A.    So one of the things that we found is design obviously
is important.  People like a device -- when they carry a
device, they like a device that actually is aesthetically
pleasing, rather than just, you know, anything.  It's
important when they put something on a desk or a table, when
they show up to a meeting, that is aesthetically appealing.

Q.    Have you noticed any changes in how products are

procured by buyers of the CF-20 and CF-33 over the years?

A.    So what we've seen is there's a lot more implements from end users in regards to the buying decisions.  So at one point we would target --

THE COURT:  Slow down just a little bit.  I'm watching you here on the realtime, and so I'm watching my reporter also.  And she's having a heart attack right now.  Okay.  So slow down.

THE WITNESS:  Sorry.

THE COURT:  All right.

THE WITNESS:  Sorry.  Can you repeat the question again for me?

THE COURT:  The question was:  Have you noticed any changes in how products are procured by buyers of the CF-20 and CF-30 over the years?

THE WITNESS:  So what we have seen is the end user has more involvement in the decision-making process.  So at a point in time years past, it was primarily IT and those in an IS role that were in -- involved in that process.  And what we're seeing now is there's a lot more involvement from end users, actual people who are using the device, and they're influencing that buying process.

BY MR. PARKER:

Q.    Mr. Rowley, do you or your team go to trade shows at which the CF-33 and CF-20 are shown?

A.   We do.

Q.   How many per year?

A.   We do approximately 40 to 50 shows, trade shows per year.

Q.   Can you give me some examples of those trade shows?

A.   We have, from a public sector, which is our police, fire, and EMS, the International Association of Chiefs of Police event is an annual event.  We do Border Patrol and Border Security event for our federal government.  And then we also do, for our enterprise business, um, a show similar to DistribuTECH, which is very focused on the utilities market.

Q.   And can you describe who -- the types of people that attend these trade shows where you and your marketing group show the CF-20 or the CF-33?

A.   There's all types'a folks that attend these types of events.  We have IT individuals.  We have end users at our public sector events.  We actually have officers who are in attendance there as well as chiefs.  We have distributors, um, and resellers of our product that are -- attend those events.  So it's a pretty well attended, a variety of individuals that are there.

Q.   Does your team bring the CF-20 and CF-33 physically to those shows?

A.   Yes.

08:54  Q.   Why do you do that?

08:54  A.   People like to see the device.  They wanna hold it. They wanna actually see the characteristics of it.

08:54  Q.   Why not just pass out spec sheets at the shows, like things like processor speed and hard drive capacity and drop resistence?  Why don't you just pass out spreadsheets or spec sheets instead of showing them the computers?

08:54  A.   Spec sheets don't always sell devices.  People like to see the device.  They like to see what they're purchasing, and the aesthetics component to that is a big part of that process.

08:54  Q.   Mr. Rowley, are you familiar with -- well, strike that.

08:54       Let me ask you a little more.  Can you describe the general environment of these trade shows?  Are they giant convention center trade shows, or are they smaller in scope, or does it vary?

08:55  A.   These particular shows are very large in scale. Multiple thousands of attendees are in, um, attendance at these shows.  Um, they're usually at a convention center or a large hall or function event similar to that.

08:55  Q.   Mr. Rowley, I'd like to show you what's been marked as Exhibit 60.

08:55       *(Document provided to the witness.)*

08:55  BY MR. PARKER:

08:55  Q.   And just looking at it, do you recognize what

8:19-CV-01118-DOC - 6/1/2022 - Day 2, Volume I

24

Exhibit 60 is?

A.   Yes.

Q.   What is Exhibit 60?

A.   It's a document that was produced, uh, for us by a company by the name'a Spiceworks.

Q.   What does Spiceworks do?

A.   They're an external agency that provides market data to us.

Q.   And do you rely on that market data, among others things, in making decisions as to how to market your products and who to market them to?

A.   We do.

Q.   Do you rely on it in the ordinary course of your job?

A.   We do.

Q.   Are these types of surveys, um, surveys that are or studies that are regularly produced in the marketing business and your business?

A.   Yes, they are.

        MR. PARKER:  Your Honor, I would move in Exhibit 60.

        THE COURT:  Received.

    *(Exhibit Number 60 received in evidence.)*

        MR. PARKER:  Can you pull up page 1 of Exhibit 60.

    *(Exhibit displayed.)*

BY MR. PARKER:

Q.   This is the Spiceworks survey that we were just talking about; correct?

A.   Correct.

MR. PARKER:  Can we look at page 2, please, Mr. Passay.  And if you can blow up, Mr. Passay, "Research Methodology," second bullet point there.

(Display adjusted.)

BY MR. PARKER:

Q.   Can you describe for the jury who the respondents of this particular survey were?

A.   IT decision makers.

Q.   What's an IT decision maker?

A.   Someone who is making decisions in regard to technology or software or applications that are used within an organization.

Q.   Can we look at page 12 -- can you turn to page 12, Mr. Rowley.

(Exhibit displayed.)

BY MR. PARKER:

Q.   And I'd like to pull up the bar chart on the right-hand side of page 12 of Exhibit 60.

(Display adjusted.)

BY MR. PARKER:

Q.   And can you describe what this chart shows?

8:19-CV-01118-DOC - 6/1/2022 - Day 2, Volume I

26

A.    It shows the influence associated with mobile device purchases, so you'll see here on the very far left 60 percent, um, 67 percent are from IT; um, 44 percent are from an executive management; 37 are from the actual end users; and then 19 are from are sort of external influences and demand in the market.

Q.    And down in the footer of this slide, there's -- there's a -- there's some text.  There's four lines of text.  I'munna have Mr. Passay blow them up for you as big as possible on that screen.

Can you tell me what the first two lines are?

A.    (Reading:)

"Who makes the final decision on the brand's operating systems for the mobile device [sic] for organization purchases," uh, "Select all that apply."

And, "What sources led your organization to" --

*(Court reporter requests clarification for the record.)*

THE COURT:  Would you state that again, please.

THE WITNESS:  Sure.

BY MR. PARKER:

Q.    Let me read them to you, Mr. Rowley.  You can tell me if I'm reading it correctly.

"Who makes the final decisions -- "Who
makes the final decision on the brands,
slash, operating systems for the mobile
devices your organization purchases?"
Parentheses, "Select all that apply,"
closed parentheses.

Did I read that correctly?

A.   You did.

Q.   And then the next question is:

"What sources led your organization to
purchase mobile devices?"

And then again it says, "Select all that apply."

A.   That is correct.

Q.   Okay.  And so turning back to the right side and the third column from your left, 37 IT professionals said -- strike that.

"37 percent of IT professionals said
that employees or end user demand had
something to do with their procurement
decisions."

Is that accurate?

A.   That is correct.

Q.   And is that consistent with your experience in the purchase of even rugged devices?

A.   Yes.

Q.   Mr. Rowley, I'd like you to take a look at Exhibit 78.

(Document provided to the witness.)

BY MR. PARKER:

Q.   Okay.  What is Exhibit 78?

A.   It is a presentation that we use for our sales team to share information in regards to our organization.

Q.   And is this also a presentation that is presented to commerce?

A.   It is.

Q.   Does it reflect how Panasonic markets the CF-33 and CF-20?

A.   It does.

Q.   And it reflects how it markets it to customers?

A.   That is correct.

MR. PARKER:  Your Honor, I move in Exhibit 78.

THE COURT:  Received.

(Exhibit Number 78 received in evidence.)

(Exhibit displayed.)

MR. PARKER:  May I publish, Your Honor?

THE COURT:  You may.

(Exhibit displayed.)

BY MR. PARKER:

Q.   So the first slide says "Mobility Solutions"; is that right, Mr. Rowley?

A.   That is correct.

Q.   And if you turn to page 3 of Exhibit 78, the slide says "Toughbook is number one for 16 consecutive years"; is that true?

A.   That is correct.

Q.   And how -- what's the measurement for the number one statement there?

A.   It's market share.

Q.   And market -- and is that correct for market share of rugged laptops?

A.   That is correct.

Q.   And who is Number 2 in market share currently?

A.   Dell is currently Number 2.

Q.   And who's Number 3?

A.   Getac.

Q.   And, Mr. Rowley, if you could turn to page 5 of Exhibit 78.  And what is on page 5?

     (Exhibit displayed.)

          THE WITNESS:  It's a history of the products that we've launched to the market.

BY MR. PARKER:

Q.   Why does Panasonic's marketing department show this slide to customers?

A.   It shows the breadth of products that we have offered, and it also shows the innovation that we have internally in the way in which we develop the product and bring it to

market.

Q.    And I see that the C-25 on the left-hand side is reflected as appearing between 1995 and 2000 on the timeline; is that correct?

A.    That is correct.

Q.    And then there's several other computers leading up to the year 2020; right?

A.    That is correct.

Q.    And that includes the CF-30, the CF-33, and the FCG-1 in this timeline?

A.    That is correct.

Q.    Now, on the right side of this timeline --

        MR. PARKER:  If you could blow up the right side in a vertical rectangle, please, Mr. Passay, capture.

    (Display adjusted.)

        MR. PARKER:  There you go.  Thank you.

BY MR. PARKER:

Q.    I see at the top there's a CF-33.

A.    Correct.

Q.    And then I see at the bottom there's a CF-20.

A.    That is correct.

Q.    So they're depicted a certain way.  And I'munna have Mr. Passay say blow it up a little more, the CF-33 in --

        THE COURT:  That's not reportable.  Restate your question.

8:19-CV-01118-DOC - 6/1/2022 - Day 2, Volume I

31

(Exhibit displayed.)

BY MR. PARKER:

Q.   So, Mr. Rowley, the picture that's now being shown you, which is the far-right upper-hand picture of Exhibit 78, page 5, the CF-33 -- is the way that the CF-33 is depicted in that picture a common way that Panasonic depicts the CF-33 in all its marketing and advertising materials?

A.   It is.  We represent the product as a 2-in-1.

Q.   And you represent it with a tablet -- well, you represent it with a tablet in the position in -- shown in the upper right-hand corner of page 5 of Exhibit 78.

A.   That is correct.

Q.   Can you turn to page 21 of Exhibit 78.

(Exhibit displayed.)

BY MR. PARKER:

Q.   And we say -- we see the same depiction on the left-hand side of Exhibit 78, page 21; correct?

A.   That is correct.

Q.   So why does Panasonic use this depiction in so much of its marketing materials?

A.   One reason is obviously to represent it as a 2-in-1. The other is to actually show the way in which the two elements of the device integrate seamlessly.  So it is very focused on the design elements there to -- to show an appealing design, as the two are actually integrated to form

a single device.

Q.    And when you say "appealing design," what do you mean?

A.    You'll notice it's a little bit difficult to see, but if you blow that up a little bit further, you'll see that in the corners, you'll see that the way in which we design the product, um, those corners are set to a point where they fit seamlessly into the actual keyboard itself.  So that is a big element of it, to make it feel more secure as well as aesthetically pleasing.

Q.    Can you take a look at page 19 of Exhibit 78 Mr. Rowley.  What is depicted on page 19 of Exhibit 78?

A.    Shows the portfolio of products that we offer to the market.

Q.    And, again, on the right-handed, we see that front-on depiction with the floating tablet of one of the CF -- either the CF-20 or the CF-33; is that accurate?

A.    That is correct.

Q.    And can you take a look at page 26 of Exhibit 78, Mr. Rowley.

       *(Exhibit displayed.)*

            MR. PARKER:  And, Mr. Passay, if you could blow up the left-hand side.

       *(Display adjusted.)*

BY MR. PARKER:

Q.    What's depicted on page 26 of 78?

Case 8:19-cv-01118-DOC-DFM    Document 474    Filed 10/22/24    Page 33 of 59   Page
ID #:23021
8:19-CV-01118-DOC - 6/1/2022 - Day 2, Volume I

33

A.    This is another device that we have that attaches to a keyboard.

Q.    And does a docking station or the docking cradle of that computer look anything like the docking cradle of the CF-33 or the CF-20?

A.    It does not.

Q.    And what product is that?

A.    That's the Q1, the FZ-Q1.

            MR. PARKER:  Can you back out, Mr. Passay?

            THE WITNESS:  I'm sorry.

        *(Court reporter requests clarification for the record.)*

            THE COURT:  Repeat your answer.

            THE WITNESS:  It was the follow-on to the FZ-Q1, which is the FZ-Q2.

BY MR. PARKER:

Q.    And that's -- is that a product Panasonic sold?

A.    It is.

Q.    And they sold it prior to introducing the CF-33 and CF-20?

A.    That is correct.

Q.    Mr. Rowley, do you recall when you first saw the Getac K120?

A.    I do.

Q.    And what was your reaction to it when you saw it?

A.   My reaction was that it was a copy of the CF-33.

Q.   And what was your reaction to the filing of this lawsuit?

A.   Um, as the owner of the brand and the development of the product, um, I felt it was appropriate because, um, we put a lot of time and effort into distinguishing our products to the market, and when you see something that comes after it that looks just like it, it -- it impedes on the value of what we're trying to do with the brand.

          MR. PARKER:  No further questions.

          THE COURT:  Cross-examination, please.

          Counsel, this is all running time, just so you're aware.

          MR. EUTERMOSER:  Thank you, Your Honor.

                    **CROSS-EXAMINATION**

BY MR. EUTERMOSER:

Q.   Mr. Rowley, you just testified that your impression of the K120 is it looked like a copy of the CF-33; right?

A.   That's correct.

Q.   Sir, you're not an engineer, are you?

A.   I am not.

Q.   You haven't seen the patents that are asserted against Getac in this case, have you?

A.   I have not.

Q.   You're not a patent attorney, are you?

A.    I am not.

Q.    You've never worked as a patent examiner, have you?

A.    I am not.

*(Court reporter requests clarification for the record.)*

THE COURT:  Slow, Counsel.  Strike the question. Slow down.

BY MR. EUTERMOSER:

Q.    You've never worked for the United States Patent and Trademark Office, have you?

A.    I have not.

Q.    You were asked about trade shows; do you recall that?

A.    Yes.

Q.    At those trade shows, Panasonic doesn't have a cash register where attendees can buy a Panasonic CF-20 or CF-33; correct?

A.    That is correct.

Q.    You also testified that in some cases, at least, end users may influence buying decisions; is that right?

A.    That is correct.

Q.    You'd agreed that performance matters to those end users; right?

A.    It's one'a the elements; correct.

Q.    Mr. Rowley, you also discussed certain characteristics of the Toughbook line of products that people've come to

know in the market; right?

A.   Correct.

Q.   And Panasonic intends that those characteristics distinguish its products from others; right?

A.   Correct.

Q.   Those characteristics are in fact a brand differentiator; right?

A.   Correct.

Q.   And that means those characteristics tell a customer that they're looking at or buying a Panasonic Toughbook as opposed to some other products; right?

A.   That is correct.

Q.   Some'a those characteristics include the fit and finish of the product?

        THE COURT:  I'm sorry, Counsel, repeat that.

BY MR. EUTERMOSER:

Q.   The fit and finish; is that right?

A.   Yes.

Q.   Those characteristics also include the type of materials used to build the device; correct?

A.   Correct.

Q.   Those characteristics also include specific branding badges, such as Toughbook, on the device; right?

A.   Correct.

Q.   There's also more subtle branding, such as the dog bone

image we've seen in some of the images and on the CF-33 and CF-20 themselves; correct?

A.    Correct.

Q.    Those characteristics also include the particular silver material finish that Panasonic uses for the body of the devices; correct?

A.    Correct.

Q.    Those characteristics also include the black and silver bezel on the outside edges of the screen; correct?

A.    Correct.

Q.    And also the textured Toughbook finish that prevents scratches; correct?

A.    Correct.

Q.    And all'a those characteristics we've just discussed distinguish Toughbook from competitor products; right?

A.    Correct.

Q.    And, again, all of those characteristics are designed so that customers know they're looking at a Toughbook as opposed to a competitor product; right?

A.    Correct.

Q.    Panasonic prides itself on being customer-focused when developing new products; is that fair?

A.    That's fair.

Q.    Panasonic prides itself on listening to the voice of its customers in developing new products; right?

A.    Yes.

Q.    In fact, Panasonic spends a significant amount of time looking at different iterations of proposed devices and having conversations with customers to get their feedback; right?

A.    Correct.

Q.    So you hear a lotta feedback from your customers; is that fair?

A.    Yes.

Q.    And you've been in your current role for a number of years; right?

A.    Correct.

Q.    And you're currently responsible for the CF-33 and CF-20?

A.    Currently responsible for marketing within the organization.

Q.    Marketing of the CF-33 and the CF-20, among other products?

A.    Correct.

Q.    And you've never heard of a single customer confusing a Getac product with a CF-20, have you?

A.    I have not.

Q.    And you've never heard of a single customer confusing a Getac product with the CF-33, have you?

A.    I have not.

Q.   You were asked about a Spiceworks survey.  We saw that in Exhibit 60.  You recall that?

A.   I do.

Q.   Panasonic didn't form any surveys to determine if any end users were deceived or confused into thinking --

THE COURT:  Repeat the question, Counsel, and also slow down just a little bit.

MR. EUTERMOSER:  Thank you, Your Honor.

BY MR. EUTERMOSER:

Q.   Let me start the question over.

Mr. Rowley, you were asked about a Spiceworks survey.  We saw that in Exhibit 60.  You recall that?

A.   Yes.

Q.   Now, Panasonic didn't perform any surveys to determine if end users were deceived or confused into thinking the K120 or UX10 were Panasonic designs; right?

A.   Correct.

Q.   Mr. Rowley, you're not aware of any specific instances of head-to-head competition between the CF-33 and the K120, are you?

A.   Not from a marketing role that wouldn't -- I wouldn't be -- no.

Q.   And you're not aware of any specific instances of head-to-head competition between the CF-20 and the -- the UX10; right?

A.    I am not.

MR. EUTERMOSER:  No further questions.  I'll pass the witness.

THE COURT:  Redirect examination, please.

MR. PARKER:  Nothing further, Your Honor.

THE COURT:  Thank you very much, sir.  We'll ask you to step down.  We're going to ask you to remain on call until next Tuesday.  The case will conclude on that date or before.  Thank you for your courtesy, sir.

*(Witness steps down, remains on call.)*

THE COURT:  Your next witness, please.

MR. LAO:  Panasonic calls Mr. Katsuhiro Kitade.

THE COURT:  Thank you.  Would you step between the double doors and raise your right hand.

Would you face me and raise your right hand, please.

**KATSUHIRO KITADE, CALLED BY THE PLAINTIFF, SWORN**

*(Witness is sworn and testifies through the Japanese language Interpreter as follows:)*

THE WITNESS:  Yes, I do.

THE COURT:  Thank you, sir.  If you'd be seated.

Would you face the jury and state your full name for the jurors, please.

THE WITNESS:  My name is Katsuhiro Kitade.

THE COURT:  Your last name, would you spell that

Case 8:19-cv-01118-DOC-DFM    Document 474    Filed 10/22/24    Page 41 of 59    Page
ID #:23029
8:19-CV-01118-DOC - 6/1/2022 - Day 2, Volume I

41

slowly, please.

THE WITNESS:  K-I-T-A-D-E.

THE COURT:  Thank you.

Direct examination by Panasonic, please.

**DIRECT EXAMINATION**

BY MR. LAO:

Q.    Mr. Kitade, where do you work?

A.    I work at Panasonic.

Q.    And how long have you worked with Panasonic?

A.    I joined Panasonic in 2005, and I have been working there since.

Q.    And what is your current title at Panasonic?

A.    I work as the creative director in the digital camera section at Panasonic.

Q.    Mr. Kitade, where did you go to school?

A.    I went to, um, school called Kyoto Institute of Technology.  In English it's Kyoto Institute of Technology.

Q.    And what did you study at the Kyoto Institute of Technology?

A.    I majored in industrial design.

Q.    Can you explain for the jury what industrial design is?

A.    Industrial design is a study -- a line of study in which you study the -- the exterior appearance of a product; for example, it's color, shape, and the feel or texture.

Q.    Earlier you said you started working at Panasonic in

2005.  Can you give the jury a summary of your career at Panasonic?

A.   I first joined Panasonic in 2005, and at first I was working in cellphone designs.  Thereafter, I went to work on smartphone designs, and in 2014, I began working on notebook and PC designs.  Thereafter, I transferred to the camera department in 2015, and I have been working there since.

Q.   I think in 2015 you said you worked in designing laptops.  Can you explain in more detail what you mean when you say you helped to design the laptop?

A.   As I had explained earlier, I was working on the exterior appearance of the notebook personal computers, and specifically, I worked on the Toughbook product.

Q.   And -- and can you explain what is the Toughbook product?

A.   Toughbook is a kind of product in which a customer uses it in very severe environments.  So in order to give the customers a sense of security, one has to express its robustness and durability in its appearance.  So that's what I paid attention to as I was working on this product.

Q.   Now, you know, one'a the products at issue in this case is Panasonic's CF-20.  What role, if any, did you have in the design of the CF-20?

A.   Well, I was on the design team in the design of CF-20. And what happens is that you first start out discussing what

Case 8:19-cv-01118-DOC-DFM    Document 474    Filed 10/22/24    Page 43 of 59   Page
ID #:23031
8:19-CV-01118-DOC - 6/1/2022 - Day 2, Volume I

43

should be the design identity of that product.  And then once you discuss this, you create the -- you design identity for the product, and then you start working on the specific exterior appearance of the product design.

Q.   Mr. Kitade, are you the inventor of any design patents?

A.   Yes.

Q.   And how many design patents are you the inventor of?

A.   So if we're talking about Japanese design patent itself, it would be around a hundred.  And for the United States design patents, it would be about 30 that has been filed -- have been filed.

Q.   And what subject areas do your design patents cover?

A.   Registrations have been made in laptop such as the design of the laptop such as the CF-20 that's at issue here, as well as cellphones, smartphones, and cameras as well.

Q.   Have you won any awards in connection with your design work?

A.   Yes.

Q.   What kind of design awards have you won?

A.   So I have received in Japan an award called a "good" design award and also the IF design award in Germany and also what's called a "Red Dot" Design Award.  So I have received those in the past.

Q.   Were the design awards that you won associated with Panasonic products?

A.   Yes.

Q.   Let's start with the good design award in Japan.  What Panasonic products were the good design awards that you won associated with?

A.   For cellphone, and also I received one for the CF-20 that's at issue here.  And also for a mirrorless camera.

Q.   What year did you win the CF-20 award?

A.   That was in 2016, yes.

Q.   You also spoke about a Red Dot Design Award, and you said that it was associated with the Panasonic product. What Panasonic product was the Red Dot Design Award associated with?

A.   That was for a full frame mirrorless camera.  It is for a product line called a Lumix S series.

Q.   Do you recall what years you won the red dot award in Germany?

        THE INTERPRETER:  Did you say "Red Dot Award in Germany"?  Interpreter couldn't hear the question.

        MR. LAO:  Oh.

BY MR. LAO:

Q.   Do you recall what years you won the Red Dot Design Award in Germany?

A.   It's pretty recent, but I don't recall the exact year, I'm sorry.

Q.   Let's turn back to the CF-20.  You mentioned that it

Case 8:19-cv-01118-DOC-DFM    Document 474    Filed 10/22/24    Page 45 of 59   Page ID #:23033
8:19-CV-01118-DOC - 6/1/2022 - Day 2, Volume I

45

won -- won Good Design Award in Japan.  Were there any other awards that the CF-20 won?

A.    Yes.  It won the IF Design Award in Germany.

Q.    Now, I wanna go back and talk about -- I think you said you were part of the design team for the CF-20.  Can you explain the design process and your role in creating the CF-20?

A.    Well, first out [verbatim], as I had said earlier, we discussed within the design team what should be the identity for this product.  And, as I said earlier, we wanted to express a robustness of the product in its external shape, so we took time to discuss that first.

So we arrived at the idea of setting an octagonal shape as its design identityidentity specifically.  So next what we did was to, um, do design study of what would happen if we incorporated this robust shape identityidentity to a detachable PC, and then we did a design study on that, and then did an evaluation of that.

So we passed on this -- um, the results of the evaluation to the engineering side, and we continued to have back and forth discussions together with the engineering section to formulate the design identityidentity in order to realize the design identityidentity as a concept to arrive at a final exterior appearance for this product.

So my role would've been to -- so my role was within

this process, design process, of the CF-20 to participate in -- had the discussion about the design identityidentity that we wanted to achieve.  And also to do the actual design of the exterior appearance.

09:36  Q.   And I'm handing you what has been previously admitted as 1350 and 1353.  These are the CF-20 and CF-33 products.

09:37        And in your hand is the CF-20.  Can you hold up and show the jury the octagonal design that you are referring to in the design identity.

09:37  A.   (Complies.)  So by the octagonal shape, I'm referring to this.  *(Indicating.)*

09:37        And this same octagonal motif is repeated also inside. *(Indicating.)*

09:37  Q.   And what is this, if -- if any, is the significance of the octagonal design on the corners and fitment to the --

09:38             THE INTERPRETER:  "Corners and fitment"?

09:38             MR. LAO:  Corners and fitment to the tablet to the holder.  Thank you.

09:38             THE WITNESS:  So we were very particular on working out the design identity with this octagonal form. And in order to be able to realize this identity, um, we were very particular about the curvature and also the way in which the cradle receives that octagonal shape so that it preserves that octagonal form.

BY MR. LAO:

Q.   And earlier I think you showed there's an octagonal form on both the inside and outside of --

THE INTERPRETER:  Oh, I haven't finished the one part:

THE WITNESS:  And we also made sure that the edges of the folder -- the side edges of the folder rises up in a way that it receives the tablet comfortably and still maintains that octagonal identity.

BY MR. LAO:

Q.   From a design perspective, what were you trying to convey with the octagonal design?

A.   So in order to give the customer a sense of security when they are using the PC, what we wanted to express was to realize this idea of toughness, robustness, durability. That's what we were trying to achieve.

Q.   Thank you.  You can set down those tablets.

I'm handing you what's been previously admitted as Exhibit 1 and Exhibit 85.

MR. LAO:  And, Mr. Passay, if you could please put on page 3 of Exhibit 1.  Page 3, sir.

(Exhibit displayed.)

MR. LAO:  Can you zoom in and scroll down to the inventors on the top.

(Display adjusted.)

BY MR. LAO:

Q.   Do you recognize this document?

A.   Yes, I do.

Q.   And you're an inventor on this '232 patent; is that right?

A.   Yes.

Q.   And can you open Exhibit 85.

A.   (Complies.)

Q.   These were the high-resolution drawings for the figure previously admitted.

     *(Exhibit displayed.)*

BY MR. LAO:

Q.   Can you look at that and tell me what was your contribution for the '323 patent.

A.   In this invention, I created the overall look of the exterior appearance of this product.

Q.   So can you flip to Exhibit 85, page 2, please.

     *(Exhibit displayed.)*

BY MR. LAO:

Q.   When you say you contributed to the overall look of this product, does that include both the front and the back of the 2-in-1 device?

A.   Yes.

Q.   Can you open what's been previously admitted as Exhibit 2.  This is the '634 patent.  And can you turn to

page 3, please.

(Exhibit displayed.)

MR. LAO: (To technician:) Scroll into the inventor section. Thank you.

(Display adjusted.)

BY MR. LAO:

Q. You're an inventor on the '634 patent; correct?

A. Yes.

Q. And can you open what's been previously admitted as Exhibit 1343.

(Exhibit displayed.)

BY MR. LAO:

Q. 1343 is the high-resolution drawings of the '634 patent. And what was your inventive contribution for the '634 patent?

A. So this portion is an area in which there are a lot of active parts, so what I did was to design the internal part of the cradle in this table, this place where I'm circling with my finger.

THE COURT: And what figure, counsel, are you looking at on this 1343, for the record?

MR. LAO: Page 1, Figure 1.

THE COURT: Figure 1.

All right. Thank you.

8:19-CV-01118-DOC - 6/1/2022 - Day 2, Volume I

50

BY MR. LAO:

Q.   Can you turn to page 2, Figure 2.

     *(Exhibit displayed.)*

BY MR. LAO:

Q.   And can you describe what your inventive contribution was on page 2, Figure 2.

A.   So like I said earlier, with the earlier drawing, this is an area in which there are lot of active working parts. So I worked with the engineers and had discussions with 'em, back and forth, in order to formulate the visual design for this.

Q.   When you say "active parts," do you mean moving parts?

A.   Right.  For example, the parts that secures the tablet.

Q.   Can you open for me Exhibit 3, the '998 patent, please.

     *(Exhibit displayed.)*

        MR. LAO:  And, Mr. Passay, can you turn to page 3, please.  And scroll into the "inventor" section.

     *(Display adjusted.)*

BY MR. LAO:

Q.   Mr. Kitade, you're an inventor on the '998 patent; is that right?

A.   Right.

Q.   And can you open for me Exhibit 432, the high-resolution images of the '998 patent, and turn to page 1.

Case 8:19-cv-01118-DOC-DFM   Document 474   Filed 10/22/24   Page 51 of 59   Page
ID #:23039
8:19-CV-01118-DOC - 6/1/2022 - Day 2, Volume I

51

*(Exhibit displayed.)*

MR. LAO:  This was previously admitted?

THE COURT:  And is this Exhibit 432?

MR. LAO:  This is Exhibit --

THE COURT:  You said "open to 432, the high-resolution images."

MR. LAO:  1342, Your Honor.

THE COURT:  All right.  Then just a moment.

And after you've turned to 1342, are you turning to page 1?

MR. LAO:  Page 1, Figure 1.

THE COURT:  Figure 1.  Thank you.

*(Exhibit displayed.)*

BY MR. LAO:

Q.   And what was your inventive contribution for the '998 patent?

A.   I created the exterior look or the design of the exterior appearance.

MR. LAO:  Pass the witness.

THE COURT:  All right.

Cross-examination, please.

**CROSS-EXAMINATION**

BY MR. DAVIS:

Q.   Good morning, Mr. Nakatani [sic]

A.   My name is "Kitade."

Q.   Oh, I'm sorry.

Good morning, Mr. Kitade.

A.   Good morning.

Q.   You worked on the design of the CF-20; correct?

A.   It's a design of the exterior appearance.

Q.   And we just heard you testify that you're an inventor on the three patents Panasonic has at issue in this case; correct?

A.   Yes.

Q.   And those patents cover the CF-20 Panasonic product; correct?

A.   Yes.

Q.   We heard you testify that you created robustness in the CF-20 through octagonal shape and the curved corners; correct?

A.   Yes.

Q.   Those details were important because they're part of the design identity of the CF-20; correct?

A.   Yes.

Q.   But you did not come up with the idea for the raised ends of the tablet holder design; correct?

THE COURT:   And, Counsel, that's a double negative.  He's going to have trouble answering that.  Reask the question.

BY MR. DAVIS:

Q.   The design for the raised ends of the CF-20 was provided by the mechanical engineering department; correct?

A.   No.

Q.   Mr. Nakatani gave the idea for the raised ends of the tablet, didn't he?

A.   That's not so.

Q.   Is it your testimony that you came up with the idea for the raised ends of the tablet holder?

A.   Yes.  I designed it within the design team.

Q.   In designing the CF-20, you designed the tablet and keyboard at the same time; correct?

A.   Yes.

Q.   The raised ends of the tablet -- I'm sorry.  Let me reask that.

The raised ends of the cradle and the tablet were designed to mirror one another; correct?

A.   Yes.

Q.   And if you changed the design of the raised ends of the cradle or the recessed portions of the tablet, then you would have to change the entire design; correct?

A.   I'm not sure if I understand the question.  What I'm having difficulty understanding is the part meaning change everything, all of the design.

Q.   You would have to change the portion of the cradle and

Case 8:19-cv-01118-DOC-DFM    Document 474    Filed 10/22/24    Page 54 of 59    Page
ID #:23042
8:19-CV-01118-DOC - 6/1/2022 - Day 2, Volume I

54

the tablet design that interfaces with the cradle; correct?

A.   You would have to change the portion of that fitment if you were to change one or the other.

Q.   In fact, you tried to you make the CF-20 design fit together like puzzle pieces; isn't that correct?

A.   Well, in a way, yes; however, rather than to say "like a puzzle," it is a detachable device.  So it would have to fit very securely.  But that's not something that, um, -- that regulates the shape of the portion that fit -- the area that fits together.

Q.   So you did not design the CF-20 to fit together like puzzle pieces?

A.   Well, what I meant to say was that they were designed to fit together snugly -- like a puzzle piece, I suppose.

Q.   Okay.  So they are designed to fit together like puzzle pieces; correct?

A.   Yes.

Q.   Mr. Kitade, your patents are not limited to just rugged detachable products, though, are they?

MR. LAO:  Objection.  Calls for a legal conclusion.

THE COURT:  Overruled.

(To the witness:) You can answer the question.

THE WITNESS:  I'm not sure.

Are you talking about the scope of the patents?

8:19-CV-01118-DOC - 6/1/2022 - Day 2, Volume I

55

BY MR. DAVIS:

Q.    Talking about the three patents at issue in this suit.

A.    What was the question again?

Q.    Are the three patents you're an inventor on in this suit limited to rugged detachable products or do they cover standard attachable products?

A.    In the patent it doesn't talk about the product of merchantability or about the products, so I would say that it covers all.

Q.    You're aware, aren't you, Mr. Kitade, that standard detachable laptops existed before your patents in this case; correct?

A.    Are you asking whether detachable devices have existed before?

Q.    Correct.

A.    I don't know about past or prior patents.

Q.    Know about prior detachable products? (Verbatim.)

A.    I know the products.

Q.    Those products existed before you filed for the patents in this suit, didn't they?

A.    Yes.

Q.    You were aware that Tatung Company in Taiwan designed a 2-in-run -- 2-in-1 detachable product ten years before you filed for your patents; correct?

A.    I don't know.

Q.   That product had had a tablet holder with 45-degree raised ends and a central release switch; correct?

THE INTERPRETER:  I'm sorry.  "45-degree"...?

MR. DAVIS:  "Raised ends."

THE INTERPRETER:  "Raised ends and"...?

MR. DAVIS:  "A central release switch."

(Question interpreted.)

THE WITNESS:  I don't know.

MR. DAVIS:  Pass the witness.

THE COURT:  Redirect examination.

**REDIRECT EXAMINATION**

BY MR. LAO:

Q.   Mr. Kitade, are you a patent lawyer?

A.   I'm not.

Q.   I wanna go back and talk about the design aesthetics we were talking about earlier.

You're on the visual aesthetics team; correct?

A.   Yes.  I'm in the exterior appearance design team.

Q.   Now, for the CF-20, we were talking the octagonal design identity.  Do you recall that?

A.   Yes.

Q.   And earlier you said, after you came up with the design identity, I believe you passed the design to the mechanical team; is that right?

A.   Yes.

Case 8:19-cv-01118-DOC-DFM   Document 474   Filed 10/22/24   Page 57 of 59   Page
ID #:23045
8:19-CV-01118-DOC - 6/1/2022 - Day 2, Volume I

57

Q.   And passed the design identity to the mechanical team, what is the design team's role in the next step of creating the CF-20 at that point?

A.   Well, thereafter, the engineering team would come back with -- uh, shares their realization of that concept.  And then we go back -- we continue to go back and forth to make adjustment.  And they may ask for something here and there.

Q.   And why is the design team still involved after you've come up with the design and you hand it over to the engineering team?

A.   Well, the reason why we continued to discuss is because we -- we try to ensure that the design concept that we came up with can be realized in actuality.

     And, in particular, this identity as a tough, um, pad -- that it's a tough-looking product and that it has an octagonal shape whether that -- those could be realized.

             MR. LAO:  No further questions.

             THE COURT:  Recross-examination.

             MR. DAVIS:  Nothing further, Your Honor.  Thank you.

             THE COURT:  All right.  We'll ask you to remain available until next Tuesday.  The case will conclude on that date or prior -- or before.  I'm sorry.

             You may step down.

     (Witness steps down, on call.)

THE COURT:  Counsel, why don't we take a 20-minute recess until 10:30.

All right.  Thank you.

(To the jury:)  We're in recess until 10:30, then.

We'll come and get you in 20 minutes.  Thank you very much.

*(Jury recesses.)*

*(Outside the presence of the jury.)*

THE COURT:  All right.

Counsel, have a good recess then are.

*(Recess held at 10:09 a.m.)*

*(Further proceedings reported by Debbie Hino-Spaan in Volume II.)*

-oOo-

**Certified for U.S. District Court CM/ECF**
**Debbie Gale, CSR 9472, RPR, CCRR**
**Federal Official Court Reporter**

-oOo-


CERTIFICATE


I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held telephone in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.


Date:   June 1, 2022


/s/ Debbie Gale

_____
DEBBIE GALE, U.S. COURT REPORTER
CSR NO. 9472, RPR, CCRR